**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **SUSAN VOGT,** | **1:17-cv-01580-LJO-JLT** |
| **Plaintiff,** | **MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| **v.** | |
| **MINNESOTA LIFE INSURANCE COMPANY,** | **(ECF No. 20)** |
| **Defendant.** | |

## I. <u>INTRODUCTION</u>

This case arises out of Defendant Minnesota Life Insurance Company's ("Minnesota Life") denial of insurance benefits to Plaintiff Susan Vogt ("Ms. Vogt" or "Plaintiff"), the beneficiary of an accidental death insurance policy, after the death of her husband, Mr. Frank Vogt, on January 18, 2017. On November 28, 2017, Minnesota Life removed this action from California Superior Court, County of Kern on the basis of diversity jurisdiction pursuant to 28 U.S.C. § 1332. ECF No. 1. Plaintiff's complaint alleges two causes of actions against Minnesota Life for breach of contract and breach of the duty of good faith and fair dealing. ECF No. 1-1, Ex. B.

On January 3, 2019, Minnesota Life filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. ECF No. 20. Mrs. Vogt filed an opposition on January 31, 2019. ECF No. 22. Minnesota Life filed a reply on February 7, 2019, ECF No. 23, and Mrs. Vogt filed a sur-reply on February 11, 2019. ECF No. 25. The issue presented on this summary judgment motion is whether Mr. Vogt's death is a covered loss under the terms of the accidental death policy and whether the terms of the

insurance policy preclude insurance coverage for Mr. Vogt's death. The Court finds it appropriate to rule on the motion without oral argument. *See* Local Rule 230(g).

## II. FACTUAL BACKGROUND[1]

On October 1, 2016, Minnesota Life issued Policy Number 39512-G-US-286 ("the Policy") to Frank Vogt. UMF 1. The Policy provided for a $150,000 benefit upon the accidental death of Mr. Vogt and named Mrs. Vogt as the beneficiary. UMF 2-3.

**A.** **Terms of Mr. Vogt's Accidental Death and Dismemberment Policy**

The Policy provides an accidental death and dismemberment insurance benefit. Declaration of Kathy Schmidt, ECF No. 20-4 ("Schmidt Decl."), Ex. A. Under the heading "Exclusions and Covered Losses[,]" the Policy in pertinent part provides as follows:

> **What is a covered loss?**
> This certificate provides limited coverage. This means we will provide benefits only when your loss results directly — and independently — from all other causes, from an accidental bodily injury which was unintended, unexpected and unforeseen.
>
> The bodily injury must be evidenced by a visible contusion or wound, except in the case of accidental drowning. The bodily injury must by the sole cause of your loss. The injury and loss must occur while your coverage is in force. Your loss must occur within 365 days after the date of the accidental injury.
>
> **What losses are not covered?**
> In no event will we pay a benefit where your loss or injury is caused directly or indirectly by, results from, or there is contribution from, any of the following:
> …
> (4) bodily or mental infirmity, illness or disease;

Schmidt Decl., Ex. A at 7.[2]

**B.** **Mr. Vogt's Medical History**

The Defendant documents a long history of Mr. Vogt's health issues over the years. *See* UMF 6-

---

[1] Unless otherwise indicated, the facts set forth in this section are drawn from facts asserted by Defendant in its statement of undisputed facts and explicitly undisputed by Plaintiff in her response to Defendant's undisputed facts. ECF No. 22-1 at 2-55 (herein "UMF"). Plaintiff also submitted an additional statement of undisputed facts to which Defendants did not respond. ECF No. 22-1 at 55-82, (herein "PSF"). The Court, for the purposes of this motion, will take Plaintiff's additional statement of facts as undisputed. *See* Fed. R. Civ. P. 56(e).
[2] Pin cites to page numbers refer to the ECF-generated pagination in the upper right-hand corner of the document.

2

23. While much of this is not material for the purposes of this motion, the Court will briefly note it here for context. Between 2000 and 2006, Mr. Vogt had knee issues requiring injections. UMF 6. Mr. Vogt broke his hip in 2010, which required Mr. Vogt to use a walker at times thereafter. UMF 7. Between 2012 and 2016, Mr. Vogt had "some dementia problems and he had some walking problems from his knee," as well as pulmonary artery disease. UMF 9-10. In September 2016, Mr. Vogt was having circulatory problems and also fell and broke his hip. UMF 11. In or around September 2016, Mr. Vogt's dementia was getting worse and he experienced night terrors and shaking of his hands. UMF 12.

In December 2016, Mrs. Vogt and her husband requested that Mr. Vogt enter palliative care, because Mrs. Vogt was having difficulty helping him since Mr. Vogt was weak in his legs and Mrs. Vogt had a shoulder issue which made it difficult for her to lift him off his bed when he was having trouble with his knee. UMF 13; PUF 115-116. However, after a nurse from Kaiser Permanente ("Kaiser") evaluated Mr. Vogt, she felt that he needed more help than palliative care would provide and arranged, together with Mr. Vogt's doctor, for Mr. Vogt to receive hospice care. UMF 13; PUF 117. Part of the reason Mr. Vogt was admitted to hospice was because of his terminal diagnosis of Parkinson's disease which was significant enough to cause weakness and multiple falls. UMF 17-18. In mid December 2016, Mr. Vogt began hospice care and at that time he was also experiencing mood swings, decreased appetite, and weight loss. UMF 20. The local fire department had come to Mr. Vogt's home several times because Mr. Vogt had fallen and Plaintiff could not lift her husband when he fell. UMF 22.

**C.    Circumstances of Mr. Vogt's Death**

On January 10, 2017, Mr. Vogt suffered a fall in his bedroom. UMF 24; PSF 118. The fire department was called and he was taken to the hospital where he was treated and diagnosed with a contusion to his hip. UMF 25. Plaintiff disputes that this was the only injury caused by the fall and states that he also hit his head and complained of head pain and headaches. *Id.* When Mrs. Vogt first found her husband on the floor of his bedroom he complained that his hip, ribs, and head hurt. UMF 121. When the fire department arrived and tried to help move him, Mr. Vogt screamed in pain and it was determined

3

that Mr. Vogt needed to be transported to the hospital. PSF 121. The ambulance and emergency room records document Mr. Vogt's complaints of head pain. PSF 124-125. After Mr. Vogt's fall, his functionality noticeably declined and the hospice nurses increased their weekly visits from twice a week to every day as a result of this decline. PSF 133-134. Mr. Vogt was unable to eat food between the time of his fall and his death one week later and he was bedbound following the fall. UMF 135-136. Within a few days of the fall, Mr. Vogt became completely nonverbal and was no longer able to take oral medications. PSF 139. Within five days of the fall, Mr. Vogt was unable to swallow and was restless and only taking water by swab. PSF 141-142. By January 17, 2017, Mr. Vogt was still not eating, was unresponsive, bedbound, and imminently dying. PSF 142-143. The hospice notes indicated that Mr. Vogt had "significantly declined since his fall on 1-10-17." PSF 141. On January 18, 2017, Mr. Vogt died at the age of 80 years old. UMF 26.

Mr. Vogt's original Certificate of Vital Record ("death certificate") was completed by Dr. Anthony H. Fung and listed Parkinson's Disease as the "Cause of Death." Schmidt Decl., Ex. C; UMF 27. When a patient who is in hospice dies, the death certificate usually indicates the terminal diagnosis that was the basis for the referral to hospice as the cause of death and Dr. Fung did not know that Mr. Vogt had fallen when he prepared the initial death certificate. *See* Plaintiff's Response to UMF 27. Dr. Fung amended Mr. Vogt's death certificate after Mrs. Vogt informed Dr. Fung of Mr. Vogt's January 10 fall. *See* UMF 28. The amended death certificate edits the "immediate cause" of death— defined as "final disease or condition resulting in death" which was previously listed on Line A of the death certificate as Parkinson's—to indicate "cardiopulmonary failure" as the immediate cause of death. Schmidt Decl., Ex. C. The amended certificate also includes additional causes of death. The certificate states "[s]equentially, list conditions, if any, leading to cause on Line A. Enter UNDERLYING CAUSE (disease or injury that initiated the events resulting in death) LAST." *Id.* Listing additional causes on the amended death certificate, Dr. Fung listed "recurrent falls" on Line B, and on Line C, he lists Parkinson's disease last. *Id.*

4

## D.    Minnesota Life's Denial of Mrs. Vogt's Claim

Mrs. Vogt submitted an accidental death claim for Mr. Vogt's death, including a letter explaining the January 10, 2017 fall, a Fall Questionnaire, and certain medical records from his fall. PSF 156-157; *see also* Declaration of Michael Horrow, ECF No. 22-2 ("Horrow Decl."), Ex. 14 at 146. After receiving some medical records,[3] Minnesota Life reviewed the records and asked for and received guidance from its in-house-medical director, Dr. Maryam Shapland. UMF 32-34. Dr. Shapland opined that the cause of Mr. Vogt's death was "his advanced PD and AD" which caused poor balance and weakness, leading to his fall. PSF 171.

On July 7, 2017, Minnesota Life denied Mrs. Vogt's accidental death claim, stating that there was not sufficient evidence that Mr. Vogt's death resulted "directly and independently from all causes, from injuries sustained in a fall on January 10, 2017." Schmidt Decl., Ex. B at 14. The denial letter refers to the amended death certificate and medical records that support the cause of death as Parkinson's and Alzheimer's in support of its denial.[4] Minnesota Life concluded that "[t]he claim is not payable as Mr. Vogt's death was caused directly or indirectly by, resulted from, or there was contribution from bodily or mental infirmity, illness or disease, specifically his severe Parkinson's and Alzheimer's disease." Schmidt Decl., Ex. B at 15.

After the commencement of this litigation, Minnesota Life learned during depositions of Minnesota Life witnesses in May 2018 that there were certain hospice records that it had not received. UMF 36. Minnesota Life then reviewed these additional records, including a review by Dr. Shapland, and again determined that there was no evidence to support Plaintiff's claim and denied benefits again in two subsequent letters dated November 15, 2018 and January 9, 2019. UMF 37-38; PSF 207.

---

[3] It appears that Minnesota Life only received 18 pages of medical records from Kaiser. PSF 165. It is not clear why this is the case since it also appears that Mrs. Vogt sent an email to Minnesota Life with a link and password for a file containing medical records from Kaiser which contained 106 pages. PSF 166-167.

[4] Alzheimer's disease is listed in a separate section as "other significant condition" contributing to death on the death certificate. Schmidt Decl., Ex. C.

### III. <u>LEGAL STANDARD</u>

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. *See id.* at 255; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Liberty Lobby, Inc.*, 477 U.S. at 249-50. A fact is "material" if its proof or disproof is essential to an element of a plaintiff's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby, Inc.*, 477 U.S. at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted).

The moving party bears the initial burden of informing the Court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323. If the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. *See* Fed. R. Civ. P. 56(c); *Liberty Lobby, Inc.*, 477 U.S. at 250.

### IV. <u>DISCUSSION</u>

Defendant Minnesota Life moves for summary judgment on Plaintiff's claims for breach of contract and breach of the duty of good faith and fair dealing relating to the accidental death and dismemberment Policy Minnesota Life issued to Mr. Vogt. ECF No. 20. Defendant argues that the breach

of contract claim fails because Plaintiff cannot demonstrate Minnesota Life denied benefits that were due under the insurance contract and that denial of Plaintiff's claim for accidental death benefits was proper under the terms of the Policy. ECF No. 20 at 2; ECF No. 20-1 at 2. Minnesota Life determined Plaintiff's claim for accidental death benefits was not payable on July 7, 2017 because Mr. Vogt's death was caused by a combination of disease factors and was not due to an accident. ECF No. 20-1 at 5. In this regard, Minnesota Life contends: "Mr. Vogt's death was a combination of two primary causes: Parkinson's disease, and cardiopulmonary failure. He also experienced recurrent fails caused by his terminal diseases." ECF No. 20-1 at 5. Minnesota Life argues that even though Mr. Vogt suffered a fall during the last week of his life, this does mean that the already "weak, frail, and terminally ill Mr. Vogt ['s]…death was caused by an accident" and that there is no medical evidence that links Mr. Vogt's January 2017 fall to his death. ECF No. 20-1 at 2. Minnesota Life also contends that the breach of the duty of good faith and fair dealing claim fails first because Plaintiff cannot show that benefits were due under the Policy and second, even if Plaintiff could show that benefits were due, she cannot show that withholding of benefits was unreasonable. ECF No. 20 at 4.

Plaintiff in opposition argues that the Policy is not enforceable as written, pointing to California Supreme Court precedent, as well as other California court cases, which have reinterpreted the language in the Policy to be less limited than it is written. ECF No. 22 at 17-19.[5] Plaintiff also has submitted

---

[5] Plaintiff initially argues that Minnesota Life's motion for summary judgment should be stricken because Defendant failed to follow the Court's Scheduling Order requiring a meet and confer prior to the filing of such a motion. ECF No. 22 at 13; *see also* ECF No. 7 at 4. Minnesota Life in reply contends that the Scheduling Order's requirement of a meet and confer prior to filing a summary judgment motion somehow did not apply here because the motion was noticed before Judge O'Neill and not before Judge Thurston who issued the scheduling order. ECF No. 23 at 10. This contention is patently ridiculous and disingenuous; the Scheduling Order's requirements apply regardless of who the motion is noticed before. Minnesota Life failed to follow the Order of this Court by failing to meet and confer prior to filing its motion and the Court could strike the instant motion for failure to comply with the Court's Order. Nevertheless, the Court proceeds with the merits of the motion since both parties have fully briefed it. Since the Court is denying Defendant's motion, the Court does not feel it needs to separately deal with the violation of the meet and confer requirements but notes that these requirements are meant to save judicial and party resources and strict compliance is required. In addition, Plaintiff filed a sur-reply to address Defendant's misrepresentation in its attorney's reply brief declaration that stated ". . . counsel for Plaintiff could not articulate any prejudice arising from the alleged non-compliance…" with the Scheduling Order. ECF No. 25 at 3. Plaintiff's sur-reply presents email evidence which indicates that Defendant's counsel's representation in her declaration was false. *Id.* at 3-4. The Court does not take such misrepresentations lightly and Defendant's counsel is cautioned to ensure accuracy in its representations to the Court and advised that any future misrepresentations will be handled with appropriate sanctions.

evidence that Plaintiff suffered a head injury when he fell on January 10, 2017 and evidence showing that his physical condition deteriorated drastically following the fall. *Id.* at 16-17. As a result, Plaintiff contends Minnesota Life is not entitled to summary judgment because she has presented evidence that Mr. Vogt's accidental fall proximately caused his death. *Id.* at 5-6. With respect the breach of the implied covenant claim, Plaintiff submits that Minnesota Life completely ignored overwhelming evidence that Mr. Vogt hit his head during his fall and failed to investigate the possibility that his death was caused by his head injury, instead rushing to judgment by focusing on Mr. Vogt's status as hospice patient. ECF No. 22 at 6.

Because Plaintiff has presented evidence which creates a genuine dispute of material fact as to what proximately caused Mr. Vogt's death, Defendant's motion for summary judgment is denied.

## A.   <u>BREACH OF CONTRACT CLAIM</u>

As an initial matter, jurisdiction in this case is based upon diversity, and both parties agree that the interpretation of the subject insurance policy is governed by the law of the State of California. *See Continental Insurance Co. v. Metro-Goldwyn-Mayer, Inc.*, 107 F.3d 1344, 1346 (9th Cir. 1997) (applying California insurance law in diversity case).

In moving for summary judgment, Minnesota Life contends that the express terms of the accidental death and dismemberment Policy are clear and unambiguous in providing that benefits are only provided when the "loss results directly – and independently – from all other causes, from an accidental bodily injury which was unintended, unexpected, and unforeseen[;]" "[t]he bodily injury must be the sole cause of [the insured's] loss[;]" and the policy specifically excludes coverage where the insured's "loss or injury is caused directly or indirectly by, results from, or there is a contribution from. . . bodily or mental infirmity, illness, or disease." ECF No. 20-1 at 7. Minnesota Life further points that Mr. Vogt's death certificate indicates that the primary causes of Mr. Vogt's death were Parkinson's disease and cardiopulmonary failure and accordingly not accidental as defined by the Policy. Minnesota Life mentions in passing the amended death certificate also "mentioned recurrent falls" as a cause of death, however, it argues Plaintiff cannot demonstrate that Mr. Vogt's death resulted directly from an

accident and was independent of all other causes. *Id.* at 7.

As Plaintiff points out, under California law, the Policy language referring to "directly and independently" of all other causes has been interpreted more broadly as permitting recovery if the accident is the "proximate cause" or "initiating cause" of the loss even if a disease may have contributed to the accident. ECF No. 22 at 17-18. Plaintiff cites three cases discussing the proper interpretation of the Minnesota Life Policy pursuant to California law: *Brooks v. Metropolitan Life Ins. Co.*, 27 Cal.2d 305 (1945); *Slobojan v. Western Travelers Life Ins. Co.*, 70 Cal.2d 432 (1969); *Nash v. Prudential Ins. Co. of Am.*, 39 Cal. App. 3d 594 (1974).

1. <u>**Legal Standard For Interpreting Accidental Death Policy Under California Law**</u>

In *Brooks v. Metropolitan Life Ins. Co.*, 27 Cal.2d 305 (1945), the Policy insured "against the results of bodily injuries ... caused directly and independently of all other causes by violent and accidental means" and further provided that the insurance would not cover "accident, injury, disability, death or any other loss caused wholly or partly, directly or indirectly, by disease or mental infirmity or medical or surgical treatment therefor." 27 Cal. 2d at 306. The insured in *Brooks* was terminally ill and was confined to his room, spending most of his time in bed, when a fire started in his bedroom causing him second and third degree burns and resulting in his death. *Id.* at 307-309. In responding to the defendant's argument that there was no liability because insured's disease and infirmity contributed to his cause of death, the California Supreme Court held that the correct rule in interpreting the language of the policy is that:

> [T]he presence of preexisting disease or infirmity will not relieve the insurer from liability if the accident is the proximate cause of death; and that recovery may be had even though a diseased or infirm condition appears to actually contribute to cause the death if the accident sets in progress the chain of events leading directly to death, or if it is the prime or moving cause.

*Id.* at 309-10. The *Brooks* Court, in finding liability could exist under the terms of the policy, held that it did not matter that the insured's weakened and infirm condition made him less able than a normal person to withstand the effects of injuries since there was "evidence from which the court could conclude that the proximate cause of his death was burns received in a fire of accidental origin." *Id.* at 310.

9

In *Slobojan v. Western Travelers Life Ins. Co.*, 70 Cal.2d 432 (1969), the insured, a police officer who made arrests, had a life insurance policy which provided for double indemnity if insured's death was accidental. The insured collapsed and died after chasing a robbery suspect in the course of his duties as a deputy sheriff. *Id.* at 439. The accidental death benefit provision stated "in pertinent part that the death of the insured must have 'resulted directly and independently of all other causes from bodily injuries caused by accident ...' and must not have resulted from 'disease' or 'bodily or mental infirmity.'" *Id.* at 442. The *Slobojan* Court reaffirmed that the correct rule for interpreting such policy provisions was the rule stated in *Brooks* and found, despite the insured's preexisting condition of mild atherosclerosis, revealed by the autopsy, the insured's accidental injury - the physical stress of the chase - "was a prime moving cause" of his death even though this aggravated his preexisting condition which contributed to his death. *Id.* at 442-43.

Relatedly, in *Nash v. Prudential Ins. Co. of Am.*, 39 Cal. App. 3d 594 (1974), the policy provided benefits if the insured "sustains accidental bodily injuries and . . . suffers the loss of life . . . as a direct result of such injuries and independently of all other causes" and expressly excluded coverage if the loss was "directly or indirectly from bodily or mental infirmity or disease or medical or surgical treatment thereof." *Id.* at 597. The insured fell from a boat, suffered a heart attack and died. The autopsy revealed a severe coronary artery disease which pre-existed the accident. *Id.* at 596-597. After a jury verdict for the defendant insurance company, the appellate court ordered a retrial due to contradictory jury instructions being provided with respect to the *Brooks* rule. The Court noted that the *Brooks* jury instruction was a proper statement of the rule "that the accident may be found to be the proximate cause of death within the meaning of the policy, even though a diseased or infirm condition may have been a contributing cause." *Id.* at 600-601. The Court found that reading the policy language to the jury as instruction of the applicable law "created an apparent contradiction with the instructions relating to causation and burden of proof" because "[t]he policy language, by itself, invited misinterpretation by laymen not versed in the legal distinctions between proximate and contributing causation, as applied in

the 'chain of events' principle established in the Brooks line of cases." *Id.* at 602-603. The Court further indicated that Plaintiff was not required to prove that the disease was not involved in causing the death of the insured. *Id.* at 601-602.

### 2. **Application**

Defendant does not argue that *Brooks* is not the correct rule under California law for interpreting accidental death policies such as the Policy it issued to Mr. Vogt. Defendant instead argues that "the evidence plainly does not show – and Plaintiff cannot prove – that Mr. Vogt's fall set 'in progress the chain of events leading directly death.'" ECF No. 20-1 at 8 (quoting *Happoldt v. Guardian Life Ins. Co. of Am.*, 90 Cal. App. 2d 386, 402 (1949)). However, for the purposes of defeating summary judgment Plaintiff must only present evidence that indicates that there is genuine dispute of material fact as to whether the fall "set[] in progress the chain of events leading directly to death." *See* Brooks, 27 Cal.2d at 310. Plaintiff, having presented such evidence, has presented a genuine factual dispute of what proximately caused Mr. Vogt's death – a question properly left for the jury to determine. *See, e.g.*, *U.S. Fid. & Guar. Co. v. Blum*, 270 F. 946, 956 (9th Cir. 1921) (when insured who suffered from fainting and dizzy spells fell out window, accidental death policy would cover loss unless death would have resulted without the fall but "it was within the province of the jury to inquire" about what "probable inference[s]" could be drawn "under all the circumstances surrounding his death"); *Heighley v. J.C. Penney Life Ins. Co.*, 257 F. Supp. 2d 1241, 1256 (C.D. Cal. 2003) ("It is evident that there is a genuine issue of material fact in dispute—whether an accident was the cause of Mrs. Heighley's death—which precludes a finding of summary judgment.").

While Minnesota Life 's contention that "[t]he fact that the fall on January 10, 2017 was the last fall Mr. Vogt experienced before his death does not require a finding that the fall somehow caused his death" may very well be true, its contention that "[t]here is no evidence from any of the medical records or any of the depositions of any of the witnesses that suggest the fall led to or caused Mr. Vogt's death" is not. *See* ECF No. 20-1 at 9. The fact that Mr. Vogt suffered a fall a week before his death may "not

require a finding that fall somehow caused his death[,]" *see id.*, however, Plaintiff has submitted sufficient evidence to present a genuine dispute of material fact on whether the fall was the "proximate cause" of Mr. Vogt's death such that it "set[] in progress the chain of events leading directly to death" as provide in *Brooks*. 27 Cal.2d at 309-310. Minnesota Life states that Mr. Vogt did not suffer a head injury as a result of the January 10, 2017 fall, only a contusion on his hip. ECF No. 20-1 at 7. However, the medical records submitted by Plaintiff, including the ambulance and emergency room records from January 10, 2017 do in fact indicate that Mr. Vogt may have experienced a head injury of some sort as a result of his fall. PSF 124-125. Mr. Vogt complained to his wife that his head hurt when she first found him on the floor after he fell and the ambulance and emergency records also make note of Mr. Vogt's complaints of head pain. PSF 123-125. Additionally, the emergency room physician, Dr. Kumar, testified that as a result of the complained of head pain after the fall, she normally would have ordered a CT scan of his brain but ultimately did not because Mr. Vogt was on hospice and the focus was more appropriately on pain management rather than diagnostics. PSF 126.

Minnesota Life also argues that "Plaintiff cannot show <u>any</u> causal link between the January 10, 2017 fall caused by his disease and his death." ECF No. 20-1 at 7 (emphasis in original). Again, the evidence submitted by Plaintiff contradicts this assertion. Plaintiff submits evidence that Mr. Vogt's functionality decreased noticeably following the fall on January 10, 2017 until the time of his death on January 18, 2017. PSF 127-143. For example, prior to the fall, Mr. Vogt was eating 1-2 meals per day and after the fall he was unable to eat any food. PSF 130, 133. Prior to his fall, Mr. Vogt was able to walk with the aid of walker, sit and watch TV, enjoy the company of the family dogs, and verbally communicate. PSF 128. After the fall, Mr. Vogt was bedridden, was barely verbal within three days of falling, and was no longer able to swallow his oral medication. PSF 131 136, 139. The hospice nurses increased the number of weekly visits to the Vogt's from twice a week to daily following the fall due to the significant decline in Mr. Vogt's functionality. PSF 134. Plaintiff also submitted a declaration of its medical expert, Dr. Martin Pietruszka, who opines that the most probable cause of Mr. Vogt's death

involves "the central nervous system and the occurrence of a subdural hematoma or subarachnoid hemorrhage, a brain contusion and/or a fluid and electrolyte imbalance resulting from brain injury." PSF 145-148.[6] He further opines that to a reasonable degree of medical certainty, it is more probable than not that one or all of these diagnoses reasonably occurred as a consequence of the head trauma Mr. Vogt suffered in the January 10, 2017 fall and that none of Mr. Vogt's prior medical diagnosis were the direct cause of his death. PSF 149, 150. Accordingly, contrary to Defendant's assertion that there is no evidence of either Mr. Vogt's head injury or of a causal link between Mr. Vogt's fall and his death, Plaintiff has presented evidence on both these points. Accordingly, there is a genuine issue of material fact for trial as to whether Mr. Vogt's disease or disease processes proximately caused his death or whether his fall proximately caused his death as defined in *Brooks*.

Defendant attempts to distinguish *Brooks* and the related line of cases from this case by stating "none of the decedents in any of these cases were in declining health of the type Mr. Vogt experienced,

---

[6] Along with its reply brief, Defendant filed an evidentiary objection to the declaration of Dr. Pietruszka, stating that it objects to the entire declaration because it is "premature expert opinion for which Minnesota Life has had no opportunity to examine the witness." ECF No. 23-2. The "premature" nature of the declaration appears to be an issue of Minnesota Life's own creation since it filed its summary judgment motion prior to the close of expert discovery and *without meeting and conferring with Plaintiff prior to filing the motion as required* by the Court's Scheduling Order. *See* ECF No. 7. Expert discovery did not close until February 11, 2019 and Minnesota Life filed its moving papers on January 3, 2019, Plaintiff filed its opposition on January 31, 2019, and Defendant replied on February 11, 2019. Minnesota Life did not request additional time to depose Dr. Pietruszka before filing its reply brief but instead simply objects to consideration of his declaration in its reply filings. The cases cited by Minnesota Life to support of its position are not on point. In *Carson Harbor Vill., Ltd. v. Unocal Corp.*, No. CV 96-3281 MMM (RCX), 2003 WL 22038700, at *3 (C.D. Cal. Aug. 8, 2003), the Court sustained Defendant's objection to the declaration of a new expert based on the law of the case doctrine and the fact that Plaintiff failed to disclose the expert witnesses in a timely fashion. Minnesota Life makes no contention that Plaintiff did not timely disclose Dr. Pietruszka as an expert. Similarly, *Sims v. Metro. Life Ins. Co.*, No. C-05-02980 TEH EDL, 2006 WL 3826716, at *3 (N.D. Cal. Dec. 27, 2006), also involved a situation where Plaintiff did not disclose expert witnesses so Defendant was unable to take the deposition at an earlier date but the parties stipulated to continuing the summary judgment hearing and the Court allowed each party to take additional depositions. The Court rejects Defendant's objection in this regard. Defendant also objects to certain statements in Dr. Pietruszka's declaration, citing to Federal Rules of Evidence 702 and 703 without elaboration. Defendant raised its evidentiary objection to the expert opinion in reply, denying Plaintiff the opportunity to respond. Because Defendant has not explained its specific objections or set forth authority supporting these objections and the Plaintiff's proffer of Dr. Pietruszka as an expert is not obviously defective, the Court declines to resolve the admissibility of the expert opinion on the record before it. *See Cortes–Irizarry v. Corporacion Insular De Seguros*, 111 F.3d 184, 188 (1st Cir.1997) (discussing the intersection of *Daubert* with summary judgment practice and concluding that "courts must be cautious—except when defects are obvious on the face of a proffer—not to exclude debatable scientific evidence without affording the proponent of the evidence adequate opportunity to defend its admissibility.").

nor were they on hospice." ECF No. 23 at 5.[7] However, both *Brooks* and *Happoldt, a case cited by Defendant*, involved insureds with declining health. *See* ECF No. 20-1 at 8. *Brooks* involved an insured who was suffering from an incurable cancer, spent most of his time in bed, was attended by day and night nurses, and "for several weeks before his death he was given morphine and other drugs in large quantities to relieve constantly increasing pain." 27 Cal. 2d at 307. The facts of *Happoldt* are also worth noting due the similarity to the facts of this case. 90 Cal. App. 2d 386 (1949). In that case, insured, who had asthma for 16 years, fell and fractured his hip and was admitted to the hospital five days after the fall. *Id.* at 391-92. He had surgery for his hip and was stable after surgery but his condition deteriorated a number of days after surgery and he died 23 days after his fall. *Id.* Not unlike the death certificate in this case, the autopsy report in *Happoldt* stated the "immediate cause of death was broncho- pneumonia and emphysema; and that other conditions were coronary sclerosis, chronic myocardial degeneration and recent fracture of the right hip." *Id.* at 393. At trial, Plaintiff contended that the "accidental fall, and the resulting broken hip suffered by the insured, set in motion a chain of events, namely, the surgery, the pneumonia, and the cardiac failure, which eventually caused death." *Id.* The verdict was for the Plaintiff and Defendant appealed, in part objecting to the jury instructions. One jury instruction provided: "[T]he burden is upon plaintiff to prove affirmatively that the accident, if any, is the proximate cause of death, and, therefore, unless you find that the fractured hip which occurred approximately one month before Mr. Happoldt's death was and is in fact the proximate, prime, or moving cause of his death or that it set in progress the chain of events leading directly to his death, your verdict must be in favor of the defendant." *Id.* at 401. The Court found that this adequately instructed jury on the burden of proof and affirmed the verdict for Plaintiff. Accordingly, the fact that Mr. Vogt was suffering from Parkinson's

---

[7] The parties dispute the purpose of hospice care. Defendant submits that hospice is "end-of-life or near end-of-life care, with the goal of supporting and comforting the patient, who is in the process of dying." UMF 13. Plaintiff disputes that "all patients who enter hospice care are at the end of their life" and submits that "[r]eceiving hospice care does not mean that death is imminent. The earlier an individual receives hospice care, the more opportunity there is to stabilize one's medical condition and address the needs of the patient. Some patients can actually improve and may be discharged from hospice care." Plaintiff's Response to UMF 13. As discussed herein, this dispute is not material for the determination here.

disease or on hospice does not preclude coverage under the Policy under California law despite Defendant's arguments.

Additionally, Defendant's argument implies that because Mr. Vogt was likely to die soon anyway, as evidenced by his placement in hospice, the insurance Policy could not provide coverage for him in his fragile and weakened state even if he experienced an accidental fall because his disease caused him to fall. ECF No. 23 at 4.[8] Defendant does not provide any support for such a contention and the Court rejects this suggestion. The fact that Mr. Vogt was ill prior to his fall and that his illness caused falls does not automatically preclude coverage. *See, e.g.*, *Johnson v. Life Investors' Ins. Co. of Am.*, 98 F. App'x 814, 818 (10th Cir. 2004) (exclusionary clause which provided that the "policy 'does not insure for any loss resulting from any injury caused or contributed to by, or as a consequence of ... any sickness or infirmity'" did not prevent recovery where insured, who had muscular dystrophy and a history of falls, fell, broke his neck and after being hospitalized developed pneumonia and died).[9] Relatedly, "[C]ourts have long rejected attempts to preclude recovery on the basis that the accident would not have happened but for the insured's illness." *Kellogg v. Metro. Life Ins. Co.*, 549 F.3d 818, 831 (10th Cir. 2008) (collecting cases from various jurisdictions); *see also U.S. Fid. & Guar. Co.*, 270 F. at 957 ("The language of this contract to the effect that the 'accidental means' must have operated 'independently of all other causes' to produce the death does not change the general rule of law that the proximate, and not a remote, cause is the one to which the law looks. . . The court is not required to search beyond the active, efficient procuring cause, to the cause of a cause…"). Whether or not Mr. Vogt was on hospice or was in poor health and likely to pass away naturally soon is irrelevant to the question of whether an accident – *i.e.* Mr. Vogt's fall on January 10, 2017- was the proximate cause of his death a mere week later. Plaintiff has presented

---

[8] Defendant's reply brief states: "It is undisputed that long before Mr. Vogt's death, he had been diagnosed with Parkinson's disease, Alzheimer's disease, and was in need of hands-on assistance. (Opp. at 1). He was referred to hospice care more than a month prior to his death because medical professionals knew that he would die soon." ECF No. 23 at 4.

[9] While *Johnson* is an unpublished opinion involving the application of Utah law and is not controlling precedent, the Court finds its reasoning persuasive. Defendant's briefing has not cited any controlling precedent to support its position otherwise.

1  sufficient evidence to defeat summary judgment in this regard and at trial must prove that the fall was
2  the "proximate cause" of his death.

3      Defendant's motion for summary judgment on the breach of contract claim is DENIED.

4  **B.**     **BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING CLAIM**

5      Minnesota Life makes two arguments in support of summary judgment on the claim for breach
6  of the implied covenant of good faith and fair dealing. ECF No. 20-1 at 9-11. First, it requests summary
7  judgment because Plaintiff cannot show that benefits were due under the Policy. The Court has already
8  found that Plaintiff has submitted evidence to show that there is genuine dispute of material fact as to
9  whether benefits were due so this argument fails. Second, even if Plaintiff could show that benefits were
10  due, Minnesota Life argues that she cannot show that withholding benefits under the Policy was
11  unreasonable because Minnesota Life reviewed all the available medical evidence and asked for guidance
12  from its in-house medical director, who analyzed the records and found no evidence linking an accidental
13  injury to Mr. Vogt's death. *Id.* at 10. Minnesota Life argues because ample evidence supports the decision
14  that benefits were not payable – based on the express terminology of the Policy – withholding of the
15  benefits was not unreasonable even if it was incorrect. *Id.* at 11. In opposition, Plaintiff submits that
16  Minnesota Life completely ignored overwhelming evidence that Mr. Vogt hit his head and failed to
17  investigate the possibility that his death was caused by a head injury prior to denying Mrs. Vogt's claim,
18  breaching the covenant of good faith and fair dealing as a result. ECF No. 22 at 6.

19      **1.**     **Legal Standard For Breach Of Covenant of Good Faith and Fair Dealing**

20      Under California law, every contract contains an implied covenant of good faith and fair dealing.
21  *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 683-84 (1988). "The implied promise requires each
22  contracting party to refrain from doing anything to injure the right of the other to receive the benefits of
23  the agreement. The precise nature and extent of the duty imposed by such an implied promise will depend
24  on the contractual purposes." *Egan v. Mut. of Omaha Ins. Co.*, 24 Cal. 3d 809, 818 (1979) (citations
25  omitted) (dealing with disability insurance). A claim for a breach of the covenant of good faith and fair

dealing requires showing: (1) benefits that are due under the policy are withheld; and (2) the reason for withholding such benefits was unreasonable, in bad faith, or without proper cause. *Staefa Control-Sys. Inc. v. St. Paul Fire & Marine Ins. Co.*, 847 F. Supp. 1460, 1475 (N.D. Cal.), *opinion amended on reconsideration*, 875 F. Supp. 656 (N.D. Cal. 1994). If benefits are withheld for "proper cause," the implied covenant is not breached. *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1151 (1990).

"The covenant of good faith and fair dealing has 'particular application' to insurers because they are 'invested with a discretionary power affecting the rights of another[.]'" *Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1161 (9th Cir. 2002) (quoting *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal.4th 342, 372 (1992)). "For the insurer to fulfill its obligation not to impair the right of the insured to receive the benefits of the agreement, it again must give at least as much consideration to the latter's interests as it does to its own" which requires "that an insurer *fully inquire* into possible bases that might support the insured's claim." *Egan*, 24 Cal. 3d at 818-19 (emphasis added). "While an insurance company has no obligation under the implied covenant of good faith and fair dealing to pay every claim its insured makes, the insurer cannot deny the claim 'without fully investigating the grounds for its denial.'" *Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 720-21 (2007), *as modified* (Dec. 19, 2007) (quoting *Frommoethelydo v. Fire Ins. Exchange*, 42 Cal. 3d 208, 215 (1986)).

Under California law, bad faith liability does not exist if the defendant on summary judgment can show that there was a genuine dispute as to coverage. *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 992 (9th Cir. 2001). A genuine dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds. *Wilson*, 42 Cal.4th at 723. An insurer is entitled to summary judgment based on a genuine dispute over coverage only where the summary judgment record demonstrates the absence of triable issues as to whether the disputed position upon which the insurer denied the claim was reached reasonably and in good faith. *Id.* at 724. In *Wilson*, the plaintiff had suffered neck injuries in a car accident and submitted an insurance claim. The defendant insurance company rejected her claim, on the grounds it was a preexisting injury. Before rejecting the claim, the insurance company did not attempt to contact

1  the plaintiff's doctor or speak with any other medical practitioner about the claim. Because the dispute

2  was as to liability on a factual dispute—not a dispute as to policy interpretation—the *Wilson* court found

3  that, without investigation, the dispute was not "genuine," and the insurance company did not have a

4  reasonable factual basis to deny the claim. *See id.* at 724–26. The Court denied summary judgment.

### 2.  **Application**

6  While Minnesota Life seems to argue that the genuine dispute rule applies here, the Court finds

7  that Plaintiff has presented evidence showing Minnesota Life failed to thoroughly investigate Mrs. Vogt's

8  claim – including a failure to investigate the fact Mr. Vogt fell a week prior to his death and its potential

9  consequences in leading to his death. Minnesota Life seems to have concluded that no inquiry into the

10  circumstances and consequences of Mr. Vogt's fall was necessary since Mr. Vogt was on hospice and

11  his health was deteriorating prior to his fall. *See* ECF No. 23 at 4. However, this ignores California case

12  law interpreting accidental death policies such as this one, which holds that a preexisting disease will not

13  relieve an insurer from liability if the accident is the proximate cause of death by setting in progress a

14  chain of events leading directly to death. *See Brooks*, 27 Cal. 2d at 309-10. Minnesota Life claims that

15  "[i]t certainly did not 'ignore evidence which supports coverage,' because no such evidence exists." ECF

16  No. 23 at 8. However, the fall and Mr. Vogt's rapid deterioration after the fall are evidence supporting

17  coverage which Minnesota Life continues to ignore.

18  In April 2017, Mrs. Vogt completed a fall questionnaire concerning Mr. Vogt's fall and she sent

19  a letter explaining Mr. Vogt's fall and included the amended death certificate, the ambulance records,

20  emergency room records, and photos of Mr. Vogt's injuries. PSF 156, 157. In June 2017, Mrs. Vogt also

21  appears to have sent an email to the Minnesota Life claims administrator, Tamara Davis, containing a

22  link for a file containing medical records which included evidence of the fall and Mr. Vogt's complaints

23  of head pain. PSF 153, 166. However, it appears that Ms. Davis was not aware that Mr. Vogt complained

24  of head pain after his fall when Plaintiff's claim was denied. PSF 170. Ms. Davis requested the hospice

25  records sometime in May 2017 but never obtained nor saw Mr. Vogt's hospice progress notes before

denying Plaintiff's claim on July 7, 2017. PSF 153, 158-161. The hospice notes documented Mr. Vogt's significant decline in functionality prior to the fall as compared to after, providing support for Plaintiff's claim for benefits. *See* PSF 162. For reasons unknown to the Court, the medical records that Minnesota Life did receive from Kaiser included 18 pages only, even though the link that Mrs. Vogt sent to Ms. Davis included 106 pages of Kaiser records. PSF 163-165, 166-167.

On June 22, 2017, Ms. Davis referred the file to medical indicating that the death certificate listed Parkinson's and Alzheimer's disease, without reference to the amended death certificate's inclusion of cardiopulmonary failure and recurrent falls as additional causes of death. PSF 169. In her notation to medical, Ms. Davis also indicated that the family claimed the insured fell and was taken to the hospital and discharged the same day. *Id.* Ms. Davis stated "Please review this information and comment on the cause/manner of death. Also, please comment as to what role, if any, the fall on 1/10/17 played in this insured death as well as bodily or mental infirmity, illness or disease." *Id.* Ms. Davis did not mention Mr. Vogt's complaints of head pain because she apparently was not aware of such complaints despite the medical records that indicated as much. PSF 170. In response to Ms. Davis' referral to medical, Dr. Shapland, a medical examiner for Minnesota Life, made note of the January 10, 2017 fall and indicated complaints of hip pain and an X-ray, but does not mention the complaints of head pain even though they presumably would have been part of the same file reviewed. PSF 171. Dr. Shapland concluded: "The records here reveal that the claimant had baseline poor balance and weakness due to his comorbid conditions, which led to his falling. Therefore, it was his advanced PD and AD that lead to his death. The information here is consistent with and supportive of the cause of death as noted on the death certificate, and the manner of death is natural." PSF 171. Dr. Shapland in her deposition acknowledged that complaints of head pain, as Mr. Vogt's record indicates, can be evidence of a head injury. PSF 173. Dr. Shapland also did not review the hospice progress notes before the denial letter was issued. PSF 174.

Neither Ms. Davis or Dr. Shapland knew that Mr. Vogt may have had a head injury as a result of the January 10, 2017 fall prior to the denial of benefits. PSF 170, 173, 176. And while Ms. Davis was

aware of the existence of hospice records and wanted to obtain them before making a determination of coverage, such records were not obtained before the denial letter was sent. PSF 160-161. It also appears that Minnesota Life did not attempt to determine California law on such accidental policies before writing its denial letter, and even Defendant's briefing glosses over the proper interpretation of its Policy under California law. *See* PSF 197-201. After the commencement of this litigation, Minnesota Life determined it was necessary to review deposition testimony of the emergency room doctor, the doctor who completed the death certificate, and one of the hospice nurses, as well as the hospice notes. PSF 202; *see also* Horrow Decl, Exs. 31-32. However, after such review it reiterated its denial in a January 9, 2019 letter that there were no records to indicate Mr. Vogt suffered any sort of head injury that could have caused or contributed to his death without doing any further investigation. PSF 205. It is not clear how Minnesota Life could determine there was no head injury that could have caused or contributed to Mr. Vogt's death without investigation. Even Dr. Shapland admitted in her deposition that complaints of head pain after a fall could be indicative a head injury but Minnesota Life concluded that there was no head injury without indicating the basis for this conclusion. *See* PSF 173.

"While the reasonableness of an insurer's claims-handling conduct is ordinarily a question of fact, it becomes a question of law where the evidence is undisputed and only one reasonable inference can be drawn from the evidence." *Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.*, 90 Cal. App. 4th 335, 346 (2001), *as modified on denial of reh'g* (July 30, 2001); *see also Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1161 (9th Cir. 2002). The Court finds that taking these facts in the light most favorable to Plaintiff, that there is more than one reasonable inference that can be drawn from Minnesota Life's claims handling and that a jury could find that Minnesota Life acted unreasonably by not conducting a thorough investigation before denying Mrs. Vogt's claim – including denying the claim without receiving a complete medical file and without thoroughly reviewing the file for indications of head injury. *See Chateau Chamberay*, 90 Cal. App. 4th at 349 (a biased investigation claim should go to the jury where "insurer failed to conduct a thorough investigation"); *Egan*, 24 Cal.3d at 819 ("it is

essential that an insurer fully inquire into possible bases that might support the insured's claim."). "A trier of fact may find that an insurer acted unreasonably if the insurer ignores evidence available to it which supports the claim. The insurer may not just focus on those facts which justify denial of the claim." *Wilson*, 42 Cal. 4th at 721 (citation omitted). While it might have been reasonable to conclude after investigation, that Mr. Vogt's head pain as a result of his fall did not cause his death, ignoring the medical records' indications of head pain and Mr. Vogt's rapid decline after the fall as shown in the hospice records that were not reviewed prior to denial, without further inquiry, is evidence of unreasonable conduct. Nor does Minnesota Life's denial of coverage appear to take in to account applicable California law in interpreting the Policy language. *See Amadeo*, 290 F.3d at 1162 ("summary judgment is not appropriate when the insurer's interpretation of the policy is sufficiently arbitrary or unreasonable that a jury could conclude it was adopted in bad faith") (citation omitted and internal quotation marks omitted).

In this case, there is sufficient evidence in the record from which a jury could conclude that Minnesota Life denied Mrs. Vogt's claim unreasonably and in bad faith. A triable issue of fact exists as to whether it was reasonable to deny Mrs. Vogt's claim on the grounds stated without evaluation or investigation of facts which supported Plaintiff's claim and whether Minnesota Life fairly evaluated the claim or considered controlling law when making its determination.

Defendant's motion for summary judgment on the breach of the duty of good faith and fair dealing claim is DENIED.

## V. CONCLUSION AND ORDER

For all the foregoing reasons, the Defendant Minnesota Life's motion for summary judgment (ECF No. 20) is **DENIED**.

IT IS SO ORDERED.

Dated:   **May 21, 2019**                 **/s/ Lawrence J. O'Neill**
                                                    UNITED STATES CHIEF DISTRICT JUDGE